## HALL v. SANNONER.

1. PARTNERS: *Their agreements for management of their business.*
   Partners may make any agreements they see proper for the management of their joint affairs; but the provisions of such agreements are liable, at least in a court of equity, to be controlled or qualified, or to be held altogether waived, when the assent of all the partners may be fairly inferred from their acts and declarations in the conduct of the firm affairs.

2. SAME: *Liability to each other for mistakes.*
   One partner is not liable to another for an honest mistake of judgment as to what will be most beneficial to the common interest.

APPEAL from *Pulaski* Chancery Court.
Hon. D. W. CARROLL, Chancellor.

*Ratcliffe & Fletcher* for appellant.

The August contract is plain and unambiguous; there is no room for construction; it means just what it says; no latitude or discretion is given to either party in the matter of making new accounts or giving credit, and if either partner sold or gave credit without the knowledge and consent of the other, he did so at his own peril, whether he thought or had reason to believe the customers were solvent and prompt paying or not.

*Blackwood & Williams* for appellee.

A partner is not liable to his copartner for a loss caused by an honest mistake of judgment, unless it amounts to *gross* negligence or ignorance. *Parsons on Part., section 224; 13 Ark., 621;* or breach of good faith amounting to *fraud. 2 Murp. (N. C.), 127; 7 Paige, 494.*

It would be inequitable to charge appellee personally, and hold him to strict account according to the letter of

the agreement. He should only be held liable in case of negligence on his part in giving credit to an insolvent and non-paying customer. Hall had access to the books, looked over the balance sheets, and must have known and acquiesced in the mode of conducting the business, and because appellee may have made a mistake of judgment in crediting parties who had hitherto paid, it is not just that he should bear the burden, while appellant participates in all the profits.

COCKRILL, C. J.  Sannoner and Hall were partners in a general wholesale and retail grocery business.  In August, 1880, they entered into arrangements looking to a dissolution of the copartnership on the first of the following January.  In the meantime the business was to continue as before, except that a limit was placed on the mode of giving credit to customers; and it was arranged that Sannoner should buy Hall's interest in the firm in January.  When the time for dissolution came, the parties disagreed about the terms of settlement, and Sannoner brought an equitable action against Hall to settle their rights as to the distribution of the notes and accounts belonging to the firm, to wind up the affairs of the concern and to effect a dissolution.  Hall answered, and also set up, by way of counter-claim, that a large part of the notes and accounts due the firm was for goods sold by Sannoner to insolvent purchasers in violation of the August agreement, and prayed that the loss as to these be charged to Sannoner in the settlement.  A Master was appointed to take testimony and state the account.  On consideration of the exceptions to his report the Chancellor charged Sannoner individually with some of the accounts, and refused to charge him with others.  Hall was dissatisfied and appealed.

Hall v. Sannoner.

The clause in the agreement under which it is alleged Sannoner is chargeable in the settlement with all unpaid accounts made after the month of August, is as follows: "There are to be no new accounts opened or goods sold on credit to any customers after this date, except to well known prompt paying solvent parties, and not to them except on short time, and with the knowledge and consent of both parties" to the agreement.

1. PART-NERS: Their agreements

It cannot be doubted that the law permits partners to enter into any agreement between themselves for the management of their joint affairs that they may deem proper. The same rules of construction apply to agreements between them as in ordinary cases, and when the intention is ascertained, effect will be given it in equity as at law. But the provisions of such agreements are liable, in a court of equity at least, to be controlled or qualified, or to be held altogether waived, when the assent of all the partners may be fairly inferred from the acts and declarations of the partners in the conduct of the firm affairs. *Haller v. Willamowicz, 23 Ark., 566; Story on Part., secs. 190–2.*

Parties may make constant variations in the terms of their agreement, which may be evidenced by conduct as well as writing. *England v. Cushing, 8 Beav., 129.*

In *Const v. Harris, Turner & Russell's Chancery Rep., 523*, Lord Eldon said: "In ordinary partnerships nothing is more clear than this, that although partners enter into a written agreement stating the terms on which the joint concern is to be carried on, yet if there be a long course of dealing, or a course of dealing not long, but still so long as to demonstrate that they have all agreed to change the terms of the written agreement, they may be held to have changed those agreements by conduct. For instance, if in a common partnership the parties agree that no one of them shall draw or accept a bill of exchange in his own

name without the concurrence of all the others, yet if they afterwards slide into a habit of permitting one of them to draw or accept bills without the concurrence of the others, this court will hold that they have varied the terms of the original agreement in that respect."

So in this case, if it has been shown that the partners, by mutual consent, continued the operation of their business after the adoption of the August agreement the same as before, they must be taken to have altered that agreement, and it cannot at the last be revived to give either party an advantage in the final settlement.

The partnership was launched May 7, and from that date until August 31, the date of the agreement above mentioned, the sales were, cash $13,178.48, credit $30,250.56. From August 31 to January 1, when the business of the firm closed, the sales were, cash $22,907.85, credit $28,781.12. The firm was dissolved by mutual consent March 2, following, and there were then $4,439.83 in notes and accounts outstanding, of which the sum of $1,512.08 was contracted after August 31, on which about the sum of $400 was afterwards paid.

Both partners devoted their personal attention to the business of the firm, though Sannoner appears to have devoted more time to the details of business in the house, while Hall did the purchasing for the firm, looked after certain cotton interest and from time to time attended to the correspondence. There was no agreement restraining sales on credit prior to August 31, and the duty of determining who should be credited and who not in the main devolved on Sannoner, aided at times by one of the salesmen who had a more general acquaintance than the others. After August 31 the credit sales were not so great as before, but a very considerable credit business was done, and apparently in the same manner as before. Hall says he does

not recollect that he was ever consulted about any of these sales, and claims to have been in the main ignorant that the business was being so conducted. He was, however, in the house daily, except during an absence of some three weeks. He had constant access to the books. Monthly balances were made out, and these showed, among other things, the amount of credit given and to whom given. Hall admits that he was in the habit of examining these balance sheets, though not for the purpose of ascertaining about credits, but only to see the totals, etc. When Hall was absent in October he wrote to Sannoner: "Hold down the credit buyers. Don't sell on time to any but first-class parties." He says he had previously told Sannoner that he had nothing to add to the agreement—that he did not want his money out in the hands of *irresponsible* parties on first of January. Sannoner says that Hall was in the habit of examining the ledger balances, which showed the names of the parties credited; that he made no protest about the credit sales to him, but always told him, when applied to about crediting any individual, that if he knew the parties were good to credit them. The last of February the parties disagreed about other matters in their renewed attempt at a settlement, and then, for the first time, Hall seems to have claimed a violation of the agreement not to sell on credit without his consent. It was too late after his conduct, and after having reaped all the benefit to be derived from the sales on credit, to claim that no sale on credit was binding on him. His declarations, both oral and written, were sufficient warrant to Sannoner, for the time at least, to believe that he waived the August agreement to the extent of getting his consent to the sales; and after standing by blindly and refusing to see what his duty prompted him to know, he can not be heard to say he did not know. It was his own fault that

he did not know all about the transactions as they occurred, and we must presume that he knew and acquiesced.

We do not think the testimony discloses fraud or wanton misconduct on the part of Sannoner in making sales on credit. He seems to have acted throughout with reasonable discretion, and the loss entailed upon the firm is not greater than might at any time be anticipated. One partner is never held answerable to another for an honest mistake of judgment as to what will be most beneficial to the common interest. *Caldwell v. Leiber, 7 Paige, 483; Story on Part., sec. 169.*

It must be presumed when Sannoner was permitted to sell on credit, that a reasonable discretion was intended to be given him, and he is not answerable for losses by insolvency of customers unless he abused his trust. *Roberts v. Totten, 13 Ark., 609.*

The decree is as favorable to appellant as it should have been, and it is affirmed.